IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| 1) TERESA BELYEU, | ) |
| 2) GARY BUDNICK, | ) |
| 3) KEITH COTTON, | ) |
| 4) BRIDGETTE DIAZ, | ) |
| 5) AMANDA DYKE, | ) |
| 6) JEFFREY FLYNN, | ) |
| 7) TIMOTHY GARRETT, | ) |
| 8) TINA GERLICH, | ) |
| 9) RYAN GLEASON, | ) |
| 10) PATRICK JOHNSON, | ) |
| 11) JERRY PENDLEY, | ) |
| 12) VINCENT POLSON, | ) |
| 13) MARINA STARK, | ) |
| 14) JORDAN TAKERIA, | ) |
| 15) GLEN THOMPSON, and | ) |
| 16) JONATHAN WATERS, | ) |
| | ) |
| Each individually and as class representatives, | ) |
| | ) |
| Plaintiffs | ) |
| | ) |
| v. | ) Case No.  3:21-cv-422 |
| | ) |
| AIR EVAC EMS, INC. d/b/a AIR | ) |
| EVAC LIFETEAM, | ) |
| | ) |
| Defendant | ) |

## **CLASS ACTION COMPLAINT**

The above noted Plaintiffs bring this action individually and on behalf of all others similarly situated ("The Class") and allege as and for their Class Action Complaint against Defendant Air Evac EMS, Inc. d/b/a AIR EVAC LIFETEAM ("Air Evac"), upon personal knowledge as to themselves, and as to all other matters upon information and belief, based upon investigation made by their attorneys.

## JURISDICTION AND VENUE

1.      This Court has original jurisdiction pursuant to 28 U.S.C § 1331 and § 1332(d)(2). The matter arises under the laws of the United States, in particular 49 U.S.C. § 41713(b)(1). Further, the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000.00 and is a class action in which Plaintiffs and members of the Class are citizens of states different from Defendant.

2.      This Court has personal jurisdiction over Defendant because it is authorized to do business and are conducting business throughout the State of Illinois; it has sufficient minimum contacts with the Illinois; and/or sufficiently avails itself of the markets of the various states of the United States, including Illinois, to render the exercise of jurisdiction by this Court.

3.      Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to this claim occurred in this District, Defendant is subject to personal jurisdiction in this District. Venue is also proper because: (a) Defendant is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District; (b) do substantial business in this District; and (c) are subject to personal jurisdiction in this District.

## <u>INTRODUCTION</u>

4.      Plaintiffs bring this action individually and on behalf of a class of others similarly situated,[1] against Air Evac. In this case, the Court must address the intersection of the Airline

---

[1] For simplicity, rather than reciting "and the Class" each time Plaintiffs are mentioned, this pleading will refer to Plaintiffs. Such usage includes the class Plaintiffs seek to represent.

Deregulation Act of 1976's ("ADA") preemption provision, 49 U.S.C. § 41713(b)(1), and Defendant's efforts to collect for emergency helicopter air ambulance transports. Plaintiffs or their loved ones were transported by Defendant in an emergent situation where there was no contractual relationship and no agreement with respect to the transports. Any obligation on Plaintiffs and the Class to pay Defendant, if any, arises solely out of state common law in the state from which the relevant transports originated.

5.      For individuals like Plaintiffs, first responders or medical personnel generally determine whether a patient needs emergency helicopter transport. The transportation is arranged, and patients are transported, without their knowledge or express or informed consent, or under the duress of life-threatening or other serious medical conditions that require immediate treatment at a hospital.

6.      There is no express contract for the payment of the prices charged for the transportation between Plaintiffs and Defendant. Given the dire circumstances, express or informed consent or negotiation of essential terms is difficult, if not impossible, because the patient is either unconscious or otherwise incapable of giving meaningful express or informed consent. Even if the parties could, theoretically, negotiate the terms of a contract, Defendant refuses to disclose its pricing, so a missing material term precludes the forming of an express contract.

7.      This case is brought on behalf of patients transported under emergent medical circumstances. By virtue of these circumstances no contractual relationship is formed prior to transport, the Plaintiffs' medical condition is emergent, and Defendants do not disclose the amounts they intend to charge for such transportation. Plaintiffs have no legal obligation to pay the Defendants the price charged for services, and one may not be imposed them by state law by

virtue of the ADA pre-emption: "[A] state … may not enact or enforce a law, regulation, or other provision having the forced and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart." 49 U.S.C. § 41713(b)(1).

8.      After the transportation is complete, Defendant sends a charge for the transportation comprised of the total of a "mileage" charge and a "helicopter rotor base charge," (collectively "charged amount") and demands payment from the Plaintiffs and the Class. Plaintiffs can include the patient transported, the legal custodian of the patient (in the case of minor patients), the estate of a deceased patient, or any person or entity from whom Defendant has demanded payment. The rate that will be charged by Defendant for the "base charge" and "mileage" is known to Defendant prior the transportation, but it is not published on its web site or otherwise disclosed to Plaintiffs. Even in instances where a family member, or even less frequently, a coherent patient themselves, signs a document with Defendant before a transport, that document does not disclose the prices to be charged. The refusal by Defendant to disclose prices is consistent with its longstanding argument that its pricing is some sort of trade secret. Defendant refuses to disclose its pricing information to prospective transport patients.

9.      Defendant bills Plaintiffs an amount that vastly exceeds both the cost to provide the transport and the fair market value of the transport. The Vice President of Air Methods Corporation, one of the largest air ambulance companies in the United States, stated that if "everybody paid their fair share, you know what the charge for this service would be? $12,000." Similar testimony was given under oath by an executive of another large air ambulance company, PHI, asserting that, on average, its operations were profitable by collecting $12,000 per transport. But Defendant charges at least four times that amount and more.

10.     The price comprising the charged amount is never disclosed to Plaintiffs by Defendant, nor is the price charged agreed to, or negotiated by Defendant and the persons charged prior to transportation of the patient. As such there is no express contract between the Plaintiffs and Defendant as to the price to be charged for any services provided.

11.     As is customary in healthcare, patients routinely assign their insurance benefits to the healthcare provider so the provider may file claims with third party insurers to obtain payment benefits. Defendant uses the assignment to directly file claims with third-party payors to obtain payment asserting that their services were for necessary, emergency medical transportation. The third-party payors make coverage determinations and issue an Explanation of Benefits ("EOB") detailing the charged amounts and the reasons for their coverage determinations. This is followed by an appeal process which Defendant may, and frequently does initiate.

12.     As part of their predatory scheme. Defendant, post transportation, has Plaintiffs sign assignment of benefits or authorization to bill forms ("AOB") prepared by Defendant without negotiation nor modification. These forms disclose the prices Defendant charges for its services and seek to bind Plaintiffs to pay *whatever* Defendant charges, regardless of the reasonableness of the charged amounts. Defendant has a preexisting legal duty and natural desire to bill Plaintiffs' insurers for the transport. And, to the extent it is enforceable, the document signed by Plaintiffs prior to transport also allows providers an assignment of benefits by Plaintiffs to Defendant. Therefore, the AOB is unenforceable as no consideration is provided to either party by the other.

Further, the AOB contains and includes a misrepresentation made by Defendant in drafting the AOB. The form has the Plaintiff recite the untrue statement that "I am financially responsible for the billed charges for the services provided to Patient by [Defendant] Air Evac holdings, LLC…." Defendant fails to disclose the complexities of the ADA and the fact that its patients may have zero liability for its transportation services.

13.     Many, if not most, of the persons transported by Defendant are incapable of entering a contract: they are unconscious, in severe distress, or they are medicated. Plaintiffs who did not enter express contracts fall into a quirky corner of the legal universe affected by the ADA. Because Defendant failed to disclose price, any contractual obligations for Plaintiffs to pay any amount could only be based upon state law.

14.     As is customary in healthcare, patients routinely assign their insurance benefits to the healthcare provider so the provider may file claims with third party insurers to obtain payment benefits. Defendant uses the assignment to directly file claims with third-party payors to obtain payment asserting that their services were for necessary, emergency medical transportation. The third-party payors make coverage determinations and issue an Explanation of Benefits detailing the charged amounts and the reasons for their coverage determinations. This is followed by an appeal process which Defendant may, and frequently does initiate.

15.     However, where the Plaintiffs insurers, or third-party payors do not have network agreements with the Defendants and, instead, reimburse only the reasonable

amount for the Defendants services, Defendants "balance bill" the Plaintiffs the difference between third party payor reimbursement, and Defendants charged amount. The balance billing process also initiates collection efforts, including dunning letters, telephone calls seeking payment, threats to turn the bills over to collection agencies, coercive payment plans, imposing medical liens against third party recovery, turning the unpaid amounts over to collection agencies, making claims against the estates of deceased patients, imposing cost of collection, attorneys fees and interest on unpaid amounts, and, in some instances, filing state-court breach of contract claims and other suits against patients.

16.   The Defendant's charges are so exorbitant that almost no third-party payor pays them in full, frequently leaving a staggering amount to be balance billed. Because the Defendant's balance bills are so high, frequently in the $10,000s, most patients cannot pay them. Defendant's actual collection rates for these receivables are very low (less than 5% pay the full billed amount).

17.   After appeals for third-party payment are exhausted, Defendant proceeds with collection efforts against the Plaintiffs. Upon information and belief Defendant engages in this practice to:

   a. increase the economic pain on the Plaintiffs so as to give Defendant leverage against third party payors in appealing reimbursement rates;

   b. threaten Plaintiffs with harsh collection efforts to coerce them into negotiated payment plans; and

   c. to gain negotiating leverage in obtaining terms more favorable to them in network agreements with third party payors.

18.     Defendant's billing practices as stated are predatory, unconscionable, and intended to inflict sever economic pain on critically injured Plaintiffs solely for the benefit of the Defendant: essentially a "your money or your life" scheme.

19.     Ascertainability of the patients transported in this regard will be easy as Defendant employs a standard authorization and consent form and gets the same executed at the time of transport if the patient is able to sign a contract regardless of whether there is any indicator that the patient is competent to enter an agreement. On information and belief, if the patient cannot execute the authorization, a crew member of Defendant may sign the agreement on behalf of the patient and indicate the reason why the patient cannot sign.

20.     The Class will include the patient transported, the legal custodian of the patient (in the case of spouses or minor or mentally disabled patients), the estate of a deceased patient, or any person or entity from whom Defendant has demanded payment for helicopter ambulance transport of themselves or another. It is expected that for each transport, there will be only one class member, though for married couples, it may be both the transported person and their spouse. Similarly, both parents of a transported child may be class members.

21.     In this action, Plaintiff, on behalf of themselves and a class, seek a declaration with respect to Plaintiffs' legal obligation, if any, with respect to payment to Defendant of the price charged for the transportation services provided and for the Court to determine the unspecified price term. For those without signed written "contracts," Plaintiffs ask the Court to find that no obligation to pay can exist given preemption

analysis under the ADA. For those with signed authorizations or contracts, Plaintiffs ask the Court to find that the absence of a price term fails to establish the existence of a contract unless the common law with respect to an implied-in-fact contract supplies a reasonable price term. Thus, ADA preemption still does not permit Defendant to collect from Plaintiffs with a signed authorization specifying a price, absent an exception to ADA preemption under Plaintiffs' second cause of action regarding an implied-in-fact contract intentionally undertaken by Defendant.

22.     Defendant's legal position is expected to be that the Airline Deregulation Act vested it with plenary power to set whatever price it chooses for transportation of patients *in extremis* who have no opportunity to decide whether they want or need transportation, and this Court, and all other courts, are powerless to decide issues related to the arbitrary and inflated prices imposed after-the-fact by Defendant.

23.     The ADA, 49 U.S.C. § 41713(b)(1) provides:

[A] State, political subdivision of a State…may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart.

24.     The text of the ADA reveals that Defendant is not a "common carrier," which is a prerequisite to being an "air carrier."   An "air carrier" provides "air transportation" which means "transportation of passengers…as a *common carrier* for compensation." 49 USC §40102(a). A "common carrier" is defined as "any carrier required by law to convey passengers…without refusal if approved fare or charge is paid in contrast to private or contract carrier."  BLACK'S LAW DICTIONARY (emphasis added).

Irregular routes indicate that a carrier is not a "common carrier." The definition from BLACKS was cited with approval in a D.C. Circuit opinion interpreting the term "common carrier," and the case also cited the presumption set by the Supreme Court of "following the common law usage where Congress has employed a term with a well-settled common law meaning." *CSI Aviation Servs v. United States DOT*, 637 F.3d 408, 415 (D.C. Cir. 2011) (finding that the company in that case was not an "air carrier" because they did not meet the definition of a "common carrier"). The absence of "approved fares or charges," in fact even publicly disclosed prices, and the absence of regular routes with fixed end points, make clear that Defendant is not a "common carrier" and should thus not be deemed an "air carrier." *Alves v. Pub. Utils. Comm'n*, 260 P.2d 785, 788 (Cal. 1953) (discussing the differences between a "common carrier between fixed termini and over regular routes" and a "highway contract carrier" that does not operate between fixed termini and over regular routes); *Railroad Comm'n of Tex. v. Cent. Freight Lines, Inc.*, 434 S.W.2d 911, 916 (Tex. App. 1968) (discussing the differences between carriers operating over "regular routes" and between fixed termini and those on "irregular routes").

25.    Defendant sends a statement for the charged amount to the Plaintiffs and demands payments for prices that the Plaintiffs never agreed to pay. In the absence of payment, Defendant initiates collections, report the amount charged as an unpaid bill to credit reporting agencies, engages in collection efforts, and seek to enforce liens via lawsuits in state courts, or seek to enforce state law related to the price or services they provide.

26.     Defendant has the option to negotiate an agreed rate with Plaintiffs' insurers. Defendant has failed or refused to enter such negotiations preferring, instead, to impose charges unilaterally after the Plaintiffs already had been transported. Defendant makes more money by refusing to negotiate and instead attempting to impose its excessive prices on Plaintiff after the fact. The Tenth Circuit described the situation thus: "Unscrupulous pricing behaviors that would not be sustainable in a true free market…are easily perpetuated in the warped market of air-ambulance service." *Eaglemed, LLC v. Cox*, 868 F.3d 893, 903 (10th Cir. 2017).

27.     Courts have taken a variety of approaches to air ambulance claims. *Wagner v. Summit Air Amb. & Air Evac Air Med*, 2017 U.S. Dist. LEXIS 177709, 2017 WL 4855391 (D. Mont. Oct. 26, 2017), refused to dismiss a complaint asserting claims like Plaintiffs herein assert. *Wagner* found that the defendant air ambulance companies in that case "knowingly incorporated a consideration term of 'reasonable worth' by their self-imposed and voluntary undertaking to omit a specific consideration term." Plaintiff alternatively, in the Second Cause of Action, assert the same type of claims herein as those asserted in *Wagner* for the signed written contract class.

28.     Absent an express, non-preempted, agreement between Plaintiffs and Defendant regarding the prices Defendant charges, Plaintiffs have no legally enforceable obligation to pay Defendant for the transportation services they provided, nor are they legally obligated to pay any amount that might be imposed by operation of state law.

29.     Contrary to the Defendant's expected contentions, ADA pre-emption applies equally to Plaintiffs and Defendant, to patients and air transportation providers

alike. There is no federal law mandating payment for the payment of air carrier services. Applying the ADA preemption provision to the Defendant, means they cannot employ or enforce any State law having the force and effect of law "related to price, route or service of an air carrier". Three United States Supreme Court cases, *Morales v. Trans World Airlines, Inc.*, 504 U.S. 375 (1992); *American Airlines, Inc. v. Wolens*, 513 U.S. 219 (1995); and *Northwest, Inc. v Ginsburg*, 572 U.S. 273 (2014) construe the preemption provision broadly, excluding only "privately ordered obligations." *Wolens*, 513 U.S. at 228. "[T]he terms and conditions airlines offer and passengers accept, are privately ordered obligations and thus do not amount to a State's enactment or enforcement of any law, rule, regulation, standard, or other provision having the force and effect of law within the meaning of the ADA pre-emption provision." *Id.* Many circuit court and district court rulings are in accord. Recently, the Tenth Circuit Court of Appeals in *Scarlett v. Air Methods,* 922 F. 3d 1053 (10th Cir. 2019) ruled that Defendant's legal entitlement to payment can only be premised upon a contract establishing mutual assent by both Defendant and the patient. No such mutual assent exists between Plaintiffs and Defendant.

30.    Defendant Air Evac EMS, Inc. d/b/a AIR EVAC LIFETEAM ("Air Evac") is incorporated under the laws of Missouri with a principal place of



business at 1001 Boardwalk Springs Place, Suite 250; O'Fallon, Missouri 63368. Air Evac claims more than 140 "mutually supporting air medical bases across 15 states."[2] Defendant Air Evac is a subsidiary of Global Medical Response, Inc. ("GMR"), a privately held company with more than 35,000 employees. GMR is owned by KKR & Co., Inc. ("KKR"), a well-known private equity group. GMR owns a large number of air ambulance companies controlling a significant percentage of the air ambulance market in the United States. Two private equity firms, KKR and American Securities, control almost two-thirds of the air ambulance market. Air ambulance companies owned by private equity firms charge, on average, $48,250 per transport which is nearly double the $28,800 charged by air ambulance companies not owned by private equity firm.[3]

31.    The problem at issue has been worse in the last year as Covid strained hospital systems, particularly rural systems, requiring many more inter-facility transports.[4]

32.    Additionally, Congress actually took one step to address the problems described above in the Consolidated Appropriations Act of 2021 (HR 133) commonly

---

[2] The figure is taken from page two of the file "AEL-Bell407-FINAL.pdf" available on Defendant's web site at this link: https://lifeteam.net/wp-content/uploads/AEL-Bell407-FINAL.pdf.

[3] See "Surprise 'Air Ambulance' Bills Are the Latest Nightmare in Private Health Insurance," Liza Featherstone, October 20, 2020, Jacobin Magazine. The article is available online at https://jacobinmag.com/2020/10/rural-hospital-helicopter-air-ambulance-bills.

[4] See for example, the air ambulance industry's perspective in "How Covid-19 Is Reshaping Air Medical Operations in the U.S.," Jen Boyer, Vertical Mag., Nov. 2, 2020, available online at https://verticalmag.com/features/how-covid-19-is-reshaping-air-medical-operations-in-the-u-s/.  Dr.  Ed Racht, the chief medical director from Defendant's parent company, Global Medical Response ("GMR") is quoted in the article.

referred to as the "Covid Relief Bill" signed into law on December 27, 2020. The relief act included the No Surprises Act intended to address large, unexpected medical bills. While it does not solve all the problems with air ambulance billing in the United States (notably, it does nothing to address problems for the uninsured), starting on January 1, 2022, the problems should improve for insured patients.[5] However, this improvement on the horizon makes even starker the injustice visited on Plaintiffs by Defendant's conduct.

## FACTS

### TERESA BELYEU

33.     Plaintiff Teresa Belyeu resides in Taylor County, Texas. Documents related to Plaintiff Belyeu's claim are attached as Exhibit 1.

34.     On November 9, 2015, Plaintiff Belyeu went to the emergency room at Abilene Regional Medical Center because she was having trouble breathing. While there, she went into septic shock because of a severe infection.

35.     On November 10, 2015, and at the direction of Plaintiff Belyeu's cardiologist, Defendant transported Plaintiff Belyeu from Abilene Regional Medical Center in Abilene, Texas to Baylor University Medical Center in Dallas, Texas where they could care for her properly.

36.     Plaintiff Belyeu does not recall signing any documents authorizing Defendant to transport her.

---

[5] The provisions of the No Surprises Act are summarized in an article by the Brookings Institution available via this link: https://www.brookings.edu/blog/usc-brookings-schaeffer-on-health-policy/2021/02/04/understanding-the-no-surprises-act/.

37.     Following the transport, Defendant billed Plaintiff Belyeu $51,593.61, which included a "base" charge of $23,650.00 and an additional $26,950.88 for mileage, plus an additional $992.73 for "other charges." The trip was 176 miles, making the charge per mile $153.13.

38.     Plaintiff Belyeu was insured by Aetna, which covered $7,364.40. That left Plaintiff with a balance bill of $44,229.21 claimed by Defendant to be owed.

39.     Plaintiff received multiple collections calls and letters from Defendant in the year following the transport. At some point, Defendant conveyed Plaintiff Belyeu's debt to Wakefield and Associates, who is now charging her interest on her already outrageous balance bill.

40.     Plaintiff Belyeu thinks it is unfair that she was told she was going to be transported by air ambulance rather than asked, especially since the charges are so inflated.

<u>GARY BUDNICK</u>

41.     Plaintiff Gary Budnick resides in Fairfield County, Ohio. Documents related to Plaintiff Budnick's claim are attached as Exhibit 2.

42.     On November 7, 2017, Plaintiff Budnick fell out of a tree and had to seek medical attention. The doctors at Hawking Valley Community Hospital in Logan, Ohio x-rayed him and discovered that he had broken his back.

43.     His doctor informed him that he needed to be transported to a bigger hospital that would be better equipped to handle his injury. He does not recall signing any documents from Defendant or the hospital authorizing Defendant to transport him.

44.     Defendant transported Plaintiff Budnick from Hawking Valley Community Hospital in Logan, Ohio to Grant Medical Center in Columbus, Ohio.

45.     Following the transport, Defendant billed Plaintiff Budnick $34,120.75, which included a "base" charge of $22,710.00 and an additional $10,122.00 for mileage, plus an additional $1,288.75 for "other charges." The trip was 42 miles, making the charge per mile $241.

46.     Plaintiff Budnick was insured by Blue Cross Blue Shield, which covered $9,597.72. That left Plaintiff with a balance bill of $24,523.03 claimed by Defendant to be owed. He received multiple collections letters from Defendant after the transport.

47.     At some point, Defendant conveyed Plaintiff Budnick's debt to Wakefield and Associates, who is now charging him 4% interest on his balance bill.

<u>KEITH COTTEN</u>

48.     Plaintiff Keith Cotten resides in Kiowa County, Oklahoma. Documents related to Plaintiff Cotten's claim are attached as Exhibit 3.

49.     On September 25, 2019, Plaintiff Cotten went to Elkview General Hospital complaining of severe chest pains. The treating physician determined Plaintiff Cotten could not be treated properly there and would need to be flown to a hospital with more capabilities.

50.     Defendant transported Plaintiff Cotten from Elkview General Hospital in Hobart, Oklahoma to Oklahoma Heart Hospital in Oklahoma City, Oklahoma later that day.

51.     Plaintiff Cotten does not recall signing any documents from Defendant prior to transport as he was medicated for the pain.

52.     Following the transport, Defendant billed Plaintiff Cotten $54,565.72, which included a "base" charge of $28,250.00 and an additional $25,773.02 for mileage, plus an additional $542.70 for "other charges." The trip was 98 miles, making the charge per mile $262.99. Defendant also billed Plaintiff Cotten $542.70 for miscellaneous charges.

53.     Plaintiff Cotten was insured by Global Health and Blue Cross Blue Shield, which covered $20,353.72. That left Plaintiff with a balance bill of $34,212.00 claimed by Defendant to be owed.

54.     In the year following the transport, Plaintiff Cotten got multiple letters and calls from Defendant attempting to collect the balance.

<u>BRIDGETTE DIAZ</u>

55.     Plaintiff Brigitte Diaz resides in Humphreys County, Tennessee. Documents related to Plaintiff Diaz's claim are attached as Exhibit 4.

56.     On July 30, 2019, Defendant transported Plaintiff Diaz from her home in McEwen, Tennessee to Skyline Medical Center in Nashville, Tennessee because she had gone into anaphylactic shock.

57.     Prior to the flight, Plaintiff Diaz asked the first responders why she needed to take an air ambulance rather than a ground ambulance and they told her that it was just in case her situation deteriorated.

58.     She does not recall signing any documents from Defendant prior to transport, and she was unable to effectively communicate with Defendant's staff while in the helicopter.

59.     Following the transport, Defendant billed Plaintiff Diaz $51,239.24, which included a "base" charge of $31,570.00 and an additional $17,963.55 for mileage, plus an additional $1,705.69 for "other charges." The trip was 57 miles, making the charge per mile $315.15.

60.     Plaintiff Diaz was uninsured at the time of the transport, leaving her with a balance bill of $51,239.24 claimed by Defendant to be owed.

61.     At some point, Defendant sold Plaintiff Diaz's debt to Wakefield and Associates, who is now charging her 10% interest on her balance bill.

<u>AMANDA DYKE</u>

62.     Plaintiff Amanda Dyke resides in Baxter County, Arkansas and is the mother of K. Dyke, a minor. Documents related to Plaintiff Dyke's claim are attached as Exhibit 5.

63.     On April 29, 2019, Defendant transported K. Dyke from Baxter Regional Hospital in Mountain Home, Arkansas to Mercy Hospital in Springfield, Missouri. K. Dyke needed spleen surgery and the surgeon at Baxter Regional Hospital was not prepared to handle the surgery on a child.

64.     Plaintiff Dyke knew Defendant was not in her insurance network, but the surgeon said she had no choice because he would not let her be transported via ground ambulance since she was in such intense pain.

65.     Plaintiff Dyke recalls signing a consent form from Defendant which allowed her daughter to be transported via air ambulance, but cost was never mentioned.

66.     Following the transport, Defendant billed Plaintiff Dyke $52,379.95, which included a "base" charge of $29,330.00 and an additional $22,614.90 for mileage, plus an additional $435.05 for "other charges." The trip was 77 miles, making the charge per mile $293.70.

67.     Plaintiff Dyke was insured by WebTPA, which covered $9,639.71. That left Plaintiff with a balance bill of $42,740.24 claimed by Defendant to be owed.

<u>JEFFREY FLYNN</u>

68.     Plaintiff Jeffrey Flynn resides in Morgan County, Illinois. Documents related to Plaintiff Flynn's claim are attached as Exhibit 6.

69.     On May 14, 2017, Defendant transported Plaintiff Flynn from Passavant Area Hospital in Jacksonville, Illinois to Memorial Medical Center in Springfield, Illinois because he had a heart attack, and the local hospital was not equipped to handle that.

70.     Plaintiff Flynn told the doctor at Passavant Area Hospital that he did not want to be flown to Springfield, and he would rather take a ground ambulance. The doctor refused Flynn's request for a ground transport.

71.     Plaintiff Flynn does not recall signing any documents from Defendant prior to transport.

72.     Following the transport, Defendant billed Plaintiff Flynn $42,741.26, which included a "base" charge of $29,530.00 and an additional $12,804.00 for mileage, plus an

additional $407.26 for medical supplies. The trip was around 44 miles, making the charge per mile $291.

73.    Plaintiff Flynn was uninsured at the time of the transport, which left him with a balance bill of $42,741.26 alleged by Defendant to be owed.

74.    Plaintiff Flynn received collections calls and letters up until the point he was represented by an attorney in this matter. At some point, Defendant conveyed Flynn's alleged debt to Wakefield and Associates who have been attempting to collect the balance bill plus interest.

75.    Plaintiff Flynn has good credit other than the alleged air ambulance bill. Defendant's adverse credit report is, on information and belief, the one thing preventing Plaintiff Flynn from getting pre-approval for a mortgage.

<u>TIMOTHY GARRETT</u>

76.    Plaintiff Timothy Garrett resides in Dodge County, Georgia. Documents related to Plaintiff Garrett's claim are attached as Exhibit 7.

77.    On May 7, 2019, Defendant transported Plaintiff Garrett from a construction site accident in Eastman, Georgia to Navicent Health in Macon, Georgia.

78.    Plaintiff Garrett and his wife indicated to the responding ambulance that they did not wish to be transported via air ambulance because they did not have the appropriate insurance to cover the cost, but the first responders told them they had no choice.

79.    Plaintiff Garrett does not recall signing anything prior to transport, and his wife does not recall signing anything either.

80.     Plaintiff Garrett's wife and children drove to the hospital in Macon, Georgia from the scene of the accident and made it to the hospital before Defendant did via Defendant's helicopter.

81.     Following the transport, Defendant billed Plaintiff Garrett $45,743.15, which included a "base" charge of $30,420.00 and an additional $14,490.00 for mileage, plus an additional $833.15 for "other charges." The trip was 45 miles, making the charge per mile $322.

82.     Plaintiff Garrett was insured by Cigna, which covered $12,458.91. That left Plaintiff with a balance bill of $33,284.24 claimed by Defendant to be owed.

<u>TINA GERLICH</u>

83.     Plaintiff Tina Gerlich resides in Maury County, Tennessee. Documents related to Plaintiff Gerlich's claim are attached as Exhibit 8.

84.     On June 29, 2019, Defendant transported Plaintiff Gerlich from the scene of a motorcycle accident in Tennessee to Vanderbilt University Medical Center in Nashville, Tennessee.

85.     A ground ambulance responded to the 911 call, but they quickly decided she needed to be transported via air ambulance as she was in and out of consciousness.

86.     She was heavily medicated for the pain at the time, and she does not recall signing any documents from Defendant or anyone else prior to transport.

87.     Following the transport, Defendant billed Plaintiff Gerlich $55,067.82, which included a "base" charge of $31,570.00 and an additional $22,769.25 for mileage,

plus an additional $728.57 for "other charges." The trip was 75 miles, making the charge per mile $303.59.

88.     Plaintiff Gerlich was insured by Healthscope and Blue Cross Blue Shield, which covered $14,161.09. That left Plaintiff with a balance bill of $40,906.73 claimed by Defendant to be owed.

89.     In the year following the transport, she got numerous collections calls and letters. At some point, Defendant conveyed her debt to Wakefield and Associates who have been attempting to collect the balance bill plus 4% interest.

<u>RYAN GLEASON</u>

90.     Plaintiff Ryan Gleason resides in Oklahoma County, Oklahoma. Documents related to Plaintiff Gleason's claim are attached as Exhibit 9.

91.     On November 19, 2020, Defendant transported Plaintiff Gleason from the scene of a motorcycle accident in Choctaw, Oklahoma to OU Medical in Oklahoma City, Oklahoma.

92.     The first responders determined he was injured severely enough that he needed to be transported via air ambulance rather than ground ambulance. However, it took around an hour to get him to a location where the air ambulance could land in order to pick him up to transport him the required 18 miles.

93.     He was heavily medicated for his injuries by the time he made it to the location of the air ambulance, so he does not remember signing any documents from Defendant.

94.     Following the transport, Defendant billed Plaintiff Gleason $36,542.00, which included a "base" charge of $29,665.00 and an additional $5,706.00 for mileage, plus an additional $1,171.00 for "other charges." The trip was 18 miles, making the charge per mile $317.

95.     Plaintiff Gleason was uninsured at the time of the accident, leaving him with a balance bill of the total $36,542.00 claimed by Defendant to be owed.

<u>PATRICK JOHNSON</u>

96.     Plaintiff Patrick Johnson resides in Colbert County, Alabama. Documents related to Plaintiff Johnson's claim are attached as Exhibit 10.

97.     On July 17, 2020, Defendant transported Plaintiff Johnson from Tuscumbia, Alabama to University of Alabama Hospital in Birmingham, Alabama.

98.     Plaintiff Johnson was not aware he was being transported by Defendant until they showed up on the scene. Neither he nor his wife recall signing any documents from Defendant prior to transport.

99.     Following the transport, Defendant billed Plaintiff Johnson $ 58,077.62, which included a "base" charge of $29,390.00, and an additional $27,622.62 for mileage, plus an additional $1,065.00 for "other charges". The trip was 102 miles, making the charge per mile $270.81.

100.    Plaintiff Johnson was insured by Blue Cross Blue Shield of Alabama, which covered $19,341.80. That left Plaintiff with a balance bill of $ 38,735.82 claimed by Defendant to be owed.

<u>TAKERIA JORDAN</u>

101.    Plaintiff Takeria Jordan resides in Wayne County, Georgia. Documents related to Plaintiff Jordan's claim are attached as Exhibit 11.

102.    On April 11, 2017, Plaintiff Jordan was in an auto accident and Defendants transported her from Wayne Memorial Hospital in Jesup, Georgia to Memorial Health University Medical Center in Savannah, Georgia.

103.    The machine required to treat her was not functioning properly at Wayne Memorial Hospital, so the staff determined she needed to be transported via air ambulance rather than ground ambulance.

104.    Plaintiff Jordan does not recall signing any forms from Defendants prior to or during the transport in which she consented to pay such sums for services provided by Defendants.

105.    Following the transport, Defendants billed Plaintiff Jordan $42,727.91, which included a "base" charge of $26,570.00, an additional $15,676.14 for mileage, plus an additional $109.71 for EKG Monitoring, and an additional $372.06 for being a night call. The trip was 57 miles, making the charge per mile $275.02.

106.    Plaintiff Jordan was uninsured at the time of the transport, leaving her with a balance bill of $42,727.91 claimed by Defendant to be owed.

107.    At some point, Defendant sold Plaintiff Jordan's debt to Wakefield and Associates, who is now charging her $6,736 in interest.

108.    This bill has added significant stress to Plaintiff Jordan who is a single mother of three children. She thinks it is unfair that she was transported by air ambulance

rather by ground ambulance because her injuries were not that severe when she did not consent, especially because the charges are inflated.

<u>JERRY PENDLEY</u>

109.    Plaintiff Jerry Pendley resides in Cleveland County, Oklahoma. Documents related to Plaintiff Pendley's claim are attached as Exhibit 12.

110.    On March 30, 2017, Defendant transported Plaintiff Pendley from Mercy Hospital in Ada, Oklahoma to Oklahoma heart hospital in Oklahoma City, Oklahoma.

111.    Plaintiff Pendley did not want to be transported via air ambulance, but his doctor gave him no choice.

112.    Plaintiff Pendley does not recall signing any documents from Defendant prior to transport.

113.    Following the transport, Defendant billed Plaintiff Pendley $44,775.63 which included a "base" charge of $24,445.00 and an additional $19,764.34 for mileage, plus an additional $566.29 for "other charges." The trip was 81.6 miles, making the charge per mile $ 242.21.

114.    Plaintiff Pendley was insured by GlobalHealth of Oklahoma, which covered $15,507.34. That left Plaintiff with a balance bill of $ 29,268.29 claimed by Defendant to be owed.

<u>VINCENT POLSON</u>

115.    Plaintiff Vincent Polson resides in Dallas County, Texas. Documents related to Plaintiff Polson's claim are attached as Exhibit 13.

116.    On February 16, 2018, Defendant transported Plaintiff Polson from the scene of a car accident near Weatherford, TX to John Peter Smith Hospital in Fort Worth, Texas.

117.    He does not recall signing any documents from Defendant prior to transport as he was disoriented from the accident.

118.    Following the transport, Defendant billed Plaintiff Polson $51,361.34, which included a "base" charge of $30,880.00 and an additional $18,662.08 for mileage, plus an additional $1,819.26 for "other charges." The trip was 58 miles, making the charge per mile $321.76.

119.    Plaintiff Polson was insured by the City of Molina, Texas, which covered $13,827.87. That left Plaintiff with a balance bill of $37,416.08 claimed by Defendant to be owed.

120.    Plaintiff Polson was receiving collection calls and letters from Defendant until he retained legal counsel for the matter.

<u>MARINA STARK</u>

121.    Plaintiff Marina Stark resides in Tulsa County, Oklahoma. Documents related to Plaintiff Stark's claim are attached as Exhibit 14.

122.    On August 12, 2016, Defendant transported Plaintiff Stark from Broken Bow Lake in McCurtain County, Oklahoma to Paris Regional Hospital in Paris, Texas.

123.    Plaintiff Stark does not recall signing any documents from Defendant prior to transport.

124.    Following the transport, Defendant billed Plaintiff $41,550.69 which included a "base" charge of $24,605.00, and an additional $15,275.40 for mileage, plus an additional $1,670.29 for "other charges". The trip was 60 miles, making the charge per mile $254.59.

125.    Plaintiff Stark was insured by Aetna, which paid $28,020.17. That left Plaintiff with a balance bill of $13,530.52 claimed by Defendant to be owed.

<u>GLEN THOMPSON</u>

126.    Plaintiff Glen Thompson resides in Oklahoma County, Oklahoma. Documents related to Plaintiff Thompson's claim are attached as Exhibit 15.

127.    On June 7, 2016, Defendant transported Plaintiff Thompson from Alliance Health Hospital in Woodward, Oklahoma to Integris Baptist Hospital in Oklahoma City, Oklahoma because Alliance Health was not equipped to treat him properly.

128.    Plaintiff Thomson does not recall signing any documents from Defendant prior to transport.

129.    Following the transport, Defendant billed Plaintiff $50,193.02, which included a "base" charge of $23,505.00, an additional $24,538.80 for mileage, and "other charges" of $2,149.22. The trip was 120 miles, making the charge per mile $204.49.

130.    Plaintiff Thompson was uninsured at the time of the transport, leaving him with a balance bill of $50,193.02 claimed by Defendant to be owed.

<u>JONATHAN WATERS</u>

131.    Plaintiff Jonathan Waters resides in Newton County, Arkansas. Documents related to Plaintiff Waters' claim are attached as Exhibit 16.

132.    On April 16, 2020, Defendant transported Plaintiff Waters from home in Marble Falls, Arkansas to Cox Medical in Branson, Missouri because his local hospital was not equipped to treat him properly.

133.    He was medicated for his pain by the time Defendant arrived, and he does not recall signing any documents from them prior to transport.

134.    Following the transport, Defendant billed Plaintiff $43,270.00, which included a "base" charge of $30,505.00, an additional $12,312.00 for mileage, plus an additional $453.00 for "other charges". The trip was 38 miles, making the charge per mile $324.00.

135.    Plaintiff Waters was insured by Medicaid which covered $8,481.45 and the ancillary charge was written-off. That left Plaintiff with a balance bill of $34,339.55 claimed by Defendant to be owed.

136.    At some point, Defendant sold Plaintiff Water's debt to Wakefield and Associates, who is now charging him 6.00% on his balance bill.

137.    **SUMMARY OF CHARGES**. The average base charge assessed against Plaintiffs was $27,912.19, the average total charge was $47,246.86, and the average balance bill allegedly owed by Plaintiffs was $37,324.72. Many of Plaintiffs had excellent insurance, but they were still left with financially devastating balance bills claimed to be owed by Defendant. The average charge per mile charged to Plaintiffs was $274.53. Notably, the average payment made by insurance was $14,432.20, which is more than the circa $12,000 per transport requires to profitably operate.

## **DEFENDANT'S PRIOR COLLECTION AND LITIGATION**

138.   On information and belief, Defendants have, without any legal entitlement to payment:

a.  filed multiple state-court breach-of-contract suits in multiple states to collect their charges, both by direct actions against a transported person and by way of making claims in interpleader actions;

b.  filed proof of claims in multiple bankruptcy cases asserting a right to be paid based on state-law breach-of-contract theories;

c.  filed claims in estate cases to recover their charges for transportation of a deceased person in multiple cases;

d.  sought more compensation from Medicare, Medicaid and Tricare insureds than is allowed under the relevant payment schedule for providers that accept assignment of benefits from Medicare, Medicaid and Tricare patients;

e.  sought more compensation from patients with commercial insurance, employer-sponsored health benefits plans, and other non-governmental third-party payers than what the insurance industry has determined to be the uniform, customary, and reasonable rate in each locality: coerced class members to enter into payment plans to pay their full billed amount in monthly installments paid over decades with interest; and enforced, or sought to enforce, subrogation claims or liens against personal injury claims or recoveries seeking their full billed amounts.

139.   Defendant's collection efforts against Plaintiffs were ongoing at the time this action was filed, and Defendant will continue efforts to collect their improperly billed amounts in the absence of relief granted by the Court in this action.

140.   There is a live and ongoing dispute between Plaintiffs and Defendant.

## CLASS ACTION ALLEGATIONS

141.   This action is brought and may be maintained as a class action pursuant to Fed. R. Civ. P. 23. The requirements of Fed. R. Civ. P. 23(a), (b)(1), (b)(2) and (b)(3) are met with respect to the Class defined as follows:

> All persons billed by Defendant, or who paid a bill from Defendant, for air medical transport that Defendant carried out from a location in [STATE(S)].

> Excluded from both Classes are Defendant, any entity in which Defendant has a controlling interest or which have a controlling interest of Defendant, and Defendant's legal representatives, assigns and successors. Also excluded are the judge to whom this case is assigned and any member of the judge's immediate family.

142.   Plaintiffs were transported from multiple states including 1) Alabama, 2) Arkansas, 3) Georgia, 4) Illinois, 5) Ohio, 6) Oklahoma, 7) Tennessee, and 8) Texas. It is anticipated that a multi-state class is certifiable based on consistency of relevant state law regarding legal issues relevant to the class. If a multi-state class is certified, it is expected to cover at least the 15 states in which Defendant has air ambulance bases. However, Plaintiffs reserve the right to seek certification of separate actions for each state from which one or more Plaintiffs were transported.

143.   Plaintiff expects to seek certification of the Class under Rules 23(b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure.

144.   The Classes will include only persons having viable claims under the applicable statute of limitation.

145.   Rule 23 permits Plaintiffs the right to redefine the Classes prior to class certification.

146.     The members of the Classes are so numerous that joinder of all members is impracticable. The exact number of Class Members is unknown as such information is in the exclusive control of Defendant. However, due to the nature of the trade and commerce involved, Plaintiffs believe the Class includes thousands of members.

147.     Publicly available data bears on numerosity. There are circa 400,000 rotary wing air ambulance transports in the United States and another 150,000 fixed wing transports. See https://aams.org/member-services/fact-sheet-faqs/. The median number of transports per air ambulance base is around 294 per year. See https://aams.org/wp-content/uploads/2017/04/Air-Medical-Services-Cost-Study-Report.pdf (Table 7 at p.10 data for "for-profit" bases).

148.     Defendant claims to have 140 bases in 15 states. See Figure 1, above. Based on the foregoing data, there are circa 41,000 transports by Defendant annually. Multiple years will be at issue in this case, so the total number of class members should exceed 100,000 persons transported by Defendant. It appears that there are nine bases in Illinois, but even one base in each of the relevant states would result in a sufficient number of transports to satisfy numerosity.

149.     Common questions of law and fact affect the rights of each Class Member and a common relief by way of declaratory judgment and injunction. Defendant's form contracts govern and relate to any agreement that may exist between Defendants Plaintiffs. Common questions include at least the following:

      a.     Did the Defendant have a fixed mileage price and "helicopter rotor base" price for the transportation before Plaintiffs and Class Members were transported?

b. Did Defendant communicate its fixed mileage price and "helicopter rotor base" price for the transportation to Plaintiffs, actually or constructively, before the patients were transported?

c. Did Defendant demand payment of a fixed mileage price and "helicopter rotor base" price for the transportation of patients when the mileage and helicopter rotor base prices sought had not been expressly agreed to by Plaintiffs?

d. What voluntary undertakings did Defendant accept regarding transportation of Plaintiffs?

e. Is there any non-preempted basis for Defendant to recover its billed fees other than via state law claims for express signed contract?

f. Whether Defendant could contract around the Court supplying the price by, for example: i) publicly disclosing its prices, for example on its web site; ii) disclosing pricing on its written contracts; or iii) negotiating with Plaintiffs' insurers on an agreed rate?

g. Whether the Court should grant injunctive relief to Plaintiffs who do not have a signed contract with Defendant to prevent all further collection efforts by Defendant?

h. Whether Plaintiffs who paid or had a third-party payor pay some or all of the charges be granted restitutionary relief for payment where there is no obligation to pay?

i. Whether Defendant should be enjoined from seeking to collect amounts not agreed to by the parties?

j. Whether Defendant is entitled any payment from Plaintiffs and, if so, the proper mechanism to determine the amount owed?

150. The claims and defenses of the named Plaintiffs are typical of the claims and defenses of the Classes. Defendant sought to collect an alleged debt for which it had no valid basis for collection since any efforts to impose a price by any court would be preempted under the ADA.

151. The named Plaintiffs will fairly and adequately assert and protect the interests of the Classes. Specifically, they have hired attorneys who are experienced in

prosecuting class action claims and will adequately represent the interests of the Classes. Neither the named Plaintiffs nor putative class counsel have a conflict of interest that will interfere with the maintenance of this class action.

152.    A class action provides a fair and efficient method for the adjudication of this controversy for the following reasons:

a.    The Class is so numerous as to make joinder impracticable but not so numerous as to create manageability problems;

b.    Prosecution of separate actions by individual members of the Class would create a risk of inconsistent and varying adjudications against Defendant when confronted with incompatible standards of conduct;

c.    Adjudications with respect to individual members of the Class could, as a practical matter, be dispositive of any interest of other members not parties to such adjudications, or substantially impair their ability to protect their interests;

d.    Defendant has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole;

e.    There are no unusual legal or factual issues which would create manageability problems; and

f.    Class adjudication is superior to individual adjudication of the claims at issue in this case.

## CAUSES OF ACTION

### First Cause of Action

**(Injunctive and Declaratory Relief Pursuant to 28 U.S.C. § 2201)**

153.    Plaintiffs incorporate the paragraphs outside of this Count as though set forth herein.

154.    28 U.S.C §2201 provides as follows:

In a case of actual controversy within its jurisdiction…any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

155.    Prior to the provision of services, no negotiation of contract terms regarding the price of Defendant's transportation services took place and Plaintiffs and Defendant did not enter into an express agreement on the price that Defendant would charge, and the Plaintiffs would pay for transport services.

156.    Defendant demands that for each transport Plaintiffs sign its form agreement. This form is common to Plaintiffs and all class members.

157.    In all instances, Defendant seeks assistance from the Plaintiffs to obtain third-party payment for the charged amounts. As a part of the collection process, Defendant makes transported parties believe that Defendant is acting as the agent of the transported person and only seeking collection from insurance. As a part of this scheme, Defendant tries to convince Plaintiffs to sign its authorization to bill form. The authorization to bill may disclose the billed charges, but it does so as a part of Defendant's misleading scheme advising Plaintiffs that without their signature insurance may not pay Air Evac which would leave the billed amount as the patient's financial responsibility. Defendant's implication was that Defendant would work for and with the patient in an effort to obtain proper reimbursement from patient's insurance plan. Defendant further implies that payment is that payment is not being sought from

Plaintiffs, but rather from their insurer. Defendant misleadingly leads Plaintiffs to believe that it was working for them.

158.   If there is no third-party payment or that payment is less than the charged amounts, Defendant demand payment ("balance bills"), threaten adverse consequences, and initiate detrimental collection efforts against Plaintiffs.

159.   In the event Plaintiffs do not pay Defendant the charged amounts, Defendant threatens collection, reports the unpaid charged amount as bad debt to credit reporting agencies, accrues interest and fees, and ultimately may file suit in state court or claims in bankruptcy for the amounts charged to coerce Plaintiffs to make payments that they do not owe, and Defendant cannot legally collect.

160.   Plaintiffs seeks injunctive and declaratory relief for the purposes of determining questions of actual controversy between the Plaintiffs and Defendant, and to determine what rights Defendant has to collect its alleged debts from Plaintiffs.

161.   Defendant has acted in a uniform manner in failing to disclose and negotiate the price they would charge for transportation services before rendering services, balance billing the Plaintiffs in the event the charged amounts are not paid and engaging in collection efforts. Defendant has also acted in a uniform manner by using the same form "agreements" related to each of its transports.

162.   Defendant has acted or refused to act on grounds that apply generally to Plaintiffs such that declaratory relief to determine whether Defendant and Plaintiffs have an enforceable agreement, the enforcement of which is not preempted by the ADA, so

that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole within the meaning of Fed. R. Civ. P. 23.

163.   Defendant has demanded payment of the charged amounts from the Plaintiffs and have threatened or initiated collection efforts against the Plaintiffs.

164.   There is an actual dispute and controversy between Plaintiffs and Defendant as to whether Defendant can demand payment for services concerning which no express price was agreed, can engage in collection efforts where no legally enforceable contract exists, can impose interest and costs of collection on Plaintiffs, and whether any attempt by Defendant to collect the amounts charged under the circumstances is prohibited by the preemption provisions of the ADA.

165.   Plaintiffs have no adequate remedy at law.

166.   Plaintiffs seek declarations to determine the rights of the Class Members, in particular:

        a.   The Court finds that Defendant and Plaintiffs, and the Class did not enter into any contract, either express or implied-in-fact, for Plaintiffs and the Class to pay the amounts charged by the Defendant for the transportation services it provided;[6]

        b.   The Court finds that Defendant has engaged in collection efforts against Plaintiffs and the Class for amounts that the Plaintiffs and the Class did not contractually agree to pay;

        c.   The Court finds that Defendant has engaged in collection efforts against Plaintiffs and the Class for amounts concerning which there was no mutual assent manifest by the Plaintiffs and the Class prior to the rendering of the services charged;

---

[6] But see Plaintiffs' alternative prayer below, in the Second Cause of Action, for a finding that an implied contract exists between the parties.

d. The Airline Deregulation Act pre-empts the imposition of any state common law contract principles that impose terms upon Plaintiffs which those parties did not expressly assent to prior to the air medical transportation services provided to them;

e. The Court finds that the emergency medical circumstances of Defendant's medical air transportation were such that patients transported cannot be implied at law to have entered into any contract for transportation, and in particular any agreement to pay whatever Defendant charged;

f. The Court finds that Airline Deregulation Act pre-empts application of state law imposing or implying at law any agreement upon the Plaintiffs to pay Defendant's charged amounts; and

g. The Court finds that Defendant's collection of any sums, absent an enforceable contract with the Plaintiff charged, was unlawful and the sums received by Defendant disgorged.

167.    Plaintiffs further seek a prospective order from the Court requiring Defendant to: (1) cease charging for the transporting of patients without an express agreement or full disclosure as to the rates for mileage and helicopter rotor base; and (2) to cease its attempts to collect outstanding bills for which no agreement as to price exists from Plaintiff and the Members of the Proposed Class, except at a price that Defendant has undertaken for the Court to set.

168.    Plaintiffs and the Proposed Class seek the disgorgement by Defendant of all sums collected by the Defendant from Plaintiffs or third-party payors who Defendant did not have a preferred provider contract with Defendant who have paid any amounts charged by the Defendant and other relief as set forth in the prayer below.

169.    Defendant's collection efforts damage the credit or financial health of Plaintiffs, cause them to incur legal fees and litigation expenses, impede their ability to

resolve personal injury claims, force them to consider filing or file bankruptcy, and expose Plaintiffs to claims for unlawful rates, interest on unpaid Defendant's charges and vexing and harassing collection efforts. As a result of Defendant's practices as described above, Plaintiffs have suffered, and will continue to suffer, irreparable harm and injury.

170.    Accordingly, Plaintiffs respectfully ask the Court to enter a permanent injunction ordering Defendant to cease and desist its practice of charging Plaintiffs for transporting patients in any amount greater than the reasonable amount set by the Court.

## Second Cause of Action - ALTERNATIVE[7]

### (Breach of Implied-in-Fact Contract)

171.    Plaintiffs repeat and re-allege paragraphs outside of this Cause of Action as if fully restated herein.

172.    Prior to sending Plaintiffs a bill, Defendant never disclosed the rates it charges for its services. As these agreements contained an undefined price term, they constituted, if anything, an implied-in-fact contract, and Defendant's intentionally

---

[7] Absent ADA preemption, application of implied contract principles to these circumstances would be obvious and straightforward. Defendant rendered a valuable service, and Plaintiffs should be obligated to pay the fair and reasonable value of that service. It would be a simple implied contract analysis. That is the result that typically obtains for emergency medical services. However, multiple courts have found that, in the context of the ADA and air ambulances, courts cannot determine the reasonable compensation to be paid. See, *Scarlett v. Air Methods,* 922 F. 3d 1053 (10th Cir. 2019). It seems that Congress created this unfortunate scenario, and Congress may need to resolve it. However, the Department of Justice argued in the *Scarlett* case that there was an equitable remedy available in view of *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 265 (2013). The United States Department of Justice argued as follows in the *Scarlett* appeal:

> No federal law governs payment disputes between air ambulances and their customers. And, in the absence of either a contract or recourse to state equitable principles, defendants would apparently have no legal basis to seek compensation from plaintiffs. It is implausible that Congress, through the…ADA, intended to prevent companies that provide an essential emergency service from obtaining compensation….But, if defendants rely on state equitable principles as the basis for their compensation, they cannot at the same time prevent plaintiffs from relying on those same principles to argue that defendants' charges are unreasonable. In short, defendants "cannot have it both ways." And where both air carriers and passengers choose to rely on state equitable law as the basis for their legal obligations, that law should not be viewed as "state-imposed," but instead as part of "the parties' voluntary undertaking," id. The parties' reliance on such law does not enlarge or replace any contractual agreement so in this limited circumstance, common-law principles of equity are not preempted by the ADA.

Brief for the United States of America filed Nov. 21, 2018 at pp. 28, 29 (citations omitted). The Second Cause of Action is pled consistent with the approach proposed by the United States Department of Justice, but that approach was rejected by the 10th Circuit in *Scarlett.* For what it is worth, Plaintiffs believe that the approach championed by the Department of Justice is correct.

undertaken obligation was to charge the fair and reasonable value of the services and materials it provided to Plaintiffs.[8]

173.   Defendant had knowingly made a business judgment to omit the price term from their implied in-fact-contract by failing to specify a price at time of contracting or disclosing their pricing in advance. Defendant entered numerous contracts in Illinois and operates business facilities in Illinois, and this activity reasonably would have placed Defendant on notice of the provisions of state law that would require consideration to be the reasonable worth of the object of the contract. Defendant has breached the implied-in-fact contract whereby the parties' understanding of the contract reasonably required Defendant to charge reasonable worth. The ADA does not prevent an air carrier from self-imposing a default term of consideration and that by intentionally omitting a price term with knowledge of applicable state law, Defendant has done just that.

174.   Instead of charging Plaintiffs the fair and reasonable value of its services and materials, Defendant breached the implied-in-fact contracts, by charging inflated prices that bear no reasonable relationship to the services rendered.

175.   By any measure, the prices Defendant charged Plaintiffs for transportation services were unreasonable. These prices far exceed the amounts paid by third-party payors, including the "uniform, customary, and reasonable" amount paid by health

---

[8] Defendant's air ambulance affiliate, Reach, has been named in a similar suit in the Northern District of California. In that case, Defendant's affiliate argued that there was no set of facts that could give rise to an implied-in-fact contract. Plaintiffs in the California case agreed with the position of Defendant's affiliate. Therefore, Plaintiffs note here that this cause of action is pled in the alternative.

insurance companies and the amount paid by Medicare and Medicaid for the same services.

176.   Defendant is expected to argue that the ADA permits it to charge any rate with no constraints under state law. In doing so, Defendant contends that it can use state law to enforce a contractual obligation on Plaintiffs, but that state law cannot supply the missing price term because of the ADA. This "have your cake and eat it too" approach has been rejected by the Supreme Court in *Dan's City Used Cars v. Pelkey*, 569 U.S. 251 (2013). To the extent the ADA does not envision an implied contract in an emergent medical situation where there is no free market, this Court should grant declaratory relief under Plaintiffs' first cause of action that Plaintiffs have no obligation to pay or create a similar exception to preemption under the ADA similar to *Dan's City Used Cars.*

177.   As a result of Defendant's breach of the implied-in-fact contracts, Plaintiffs have incurred damages in the amount of the overcharges levied by Defendant. Plaintiffs are therefore entitled to actual damages, pre-judgment interest, and such other relief as set forth in the prayer below.

## **PRAYER FOR RELIEF**

**THEREFORE**, Plaintiffs, individually and on behalf of the Class of persons described herein, pray for an Order as follows:

a)   Entering an order certifying the Classes (and subclasses, if applicable), designating Plaintiffs as the class representatives, and designating the undersigned as class counsel;

b)   Awarding consequential damages;

c)   Awarding Plaintiffs all costs and disbursements, including attorneys' fees, experts' fees, and other class action related expenses;

d)     Imposing a constructive trust, where appropriate, on amounts wrongfully collected from Plaintiffs pending resolution of their claims herein;

e)     Issuing appropriate declaratory and injunctive relief to declare the rights of Plaintiffs including, but not limited to a declaration that, absent a signed agreement specifying a price, Defendant is precluded from collecting anything from transported patients;

f)     In the alternative, finding that Defendant has breached an implied-in-fact contract for Plaintiffs to pay the reasonable worth of Defendant's services and granting damages;

g)     Awarding pre-judgment and post-judgment interest; and

h)     Granting such further relief as the law allows and the Court deems just.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all claims and issues.

Respectfully submitted,

**ARMBRUSTER DRIPPS WINTERSCHEIDT & BLOTEVOGEL LLC**

/s/ Charles W. Armbruster
Charles W. Armbruster #6211630
Roy C. Dripps #6182013
Michael T. Blotevogel # 6282543
51 Executive Plaza Ct.
Maryville, IL 62062
(800) 917-1529 - Telephone
(800) 927-1529 - Facsimile
charlesa@adwblaw.com
royd@adwblaw.com
mikeb@adwblaw.com